IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION AT COVINGTON

CIVIL ACTION NO. 2:21-00015 (WOB-CJS)

MMCPM LOGISTICS, LLC,

                                                      PLAINTIFF,

VS.                  <u>MEMORANDUM OPINION AND ORDER</u>

CLARITY RETAIL, LLC,
ET AL.,                                                DEFENDANTS.

Before the Court are two motions for summary judgment, the first filed by third-party defendants Myron Miller, Summer Miller, and MMCPM, LLC, the second filed by MMCPM Logistics. For the following reasons, both motions will be granted.

*Factual and Procedural Background*

Myron and Summer Miller own two companies: MMCPM Logistics, and MMCPM, LLC. (Doc. 100-1 at 30; Doc. 101-1 at 10-11). Despite similar names, the two companies do different things. MMCPM Logistics is a packing and shipping company. (Doc. 96-6 ¶2). MMCPM, LLC is an installation company. (*Id.* ¶3).

The two companies have separate bank accounts and employer identification numbers. (Doc. 96-12 ¶2). They were started within a year of each other and operate out of the same office. (Doc. 101-1 at 22-23). The Millers use the same email addresses when corresponding with their customers, regardless of whether it's an MMCPM Logistics customer or an MMCPM, LLC customer. (*Id.* at 90-

91). Summer Miller worked for both companies, but she could not say how she split her time between the two. (*Id.* at 31–32). Only MMCPM Logistics was a party to the contract in this case. (Doc. 78-2).

In August 2018, Clarity and MMCPM Logistics entered into a contract for the packing and shipping of retail store packages to Clarity's customer Dollar Tree. (Doc. 78-1). The deal worked well, so when Clarity acquired a new customer, Family Dollar, the parties decided to enter into a new contract covering the work for both Dollar Tree and Family Dollar. (Doc. 78-2). That's the contract at issue in this case.

But before the parties could enter that contract, they needed a plan for how they would handle the increased volume of work. They met in December 2018 to discuss the building capacity that MMCPM Logistics would need in order to handle the work. (Doc. 103-1 at 21). MMCPM Logistics considered three options to increase its capacity in order to handle the increased workload: (1) buying another building, (2) adding a new building next to their current building, or (3) modifying their current building. (*Id.* at 26–27). Clarity didn't tell MMCPM Logistics which option to choose or how much square footage had to be added. Instead, Clarity deferred to MMCPM Logistics' expertise and allowed it to choose. (*Id.* at 8–9).

A couple of months later, MMCPM Logistics told Clarity that it had signed contracts to begin "additions/remodels" on its current building. (Doc. 96-16). Those renovations included adding a loading dock and ramp space, new electrical work, a production room, and 1,300 square feet of custom pallet rack spaces. (Doc. 100-1 at 56–57, 65). No additional floor space was added. (*Id.* at 65). Altogether the work cost MMCPM Logistics over $78,000. (Doc. 100-3).

Clarity representatives later said they knew that MMCPM Logistics had spent that money to renovate its building. (Doc. 102-1 at 13). Clarity also said that, with regard to the three options for expanding its workload capacity, "[MMCPM Logistics] fulfilled what they said they were going to do, but they failed to expand their capacity to store and be able to work with adequate space." (Doc. 103-1 at 27).

In February 2019, while the renovations to MMCPM Logistics' building were ongoing, the parties signed the contract at issue here. (Doc. 78-2). After the signing, but before the first Family Dollar shipments were scheduled to go out, Clarity officers expressed interest in moving its packing and shipping logistics in-house to save money. (Doc. 96-13). To that end, Clarity sent one of its employees to MMCPM Logistics' warehouse to observe their operations and report back. (Doc. 96-14).

A couple of months later, in July 2019, Clarity started doing shipments to Family Dollar to test its logistics capabilities. (Doc. 96-6 ¶7). MMCPM Logistics discovered this when Family Dollar stores on its upcoming shipments list began disappearing from that list. (*Id.*).

Over time, the parties' relationship started to sour. There were issues with missing information and inventory. (Doc. 96-5). Last minute changes were made to shipments. (Doc. 96-8). MMCPM Logistics' invoices went unpaid, and Clarity said there was nothing to be done about that because it was "out of options with borrowing from people and places." (Doc. 96-6 ¶6; Doc. 96-10). Clarity felt that MMCPM Logistics' building was "woefully inadequate in terms of storage and maneuverability and that type of thing[,]" but Clarity doesn't know whether that assessment came before or after the contract was signed. (Doc. 103-1 at 24-25).

Eventually MMCPM Logistics exercised its right to end part of the contract. (Doc. 96-11). The Dollar Tree portion of the work done under the contract had continued to go well, so the parties continued on with that work. The Family Dollar portion of the contract was the cause of all the trouble, so that part was terminated. The termination letter was on MMCPM Logistics letterhead and was signed by Summer Miller. Below Summer's name and signature appeared "MMCPM, LLC." (*Id.*).

Despite the fact that the parties opted to continue the work for the Dollar Tree stores, Clarity still wasn't paying MMCPM Logistics' invoices. MMCPM Logistics eventually ended the Dollar Tree portion of the contract as well.

MMCPM Logistics sued Clarity and several other defendants in state court. (Doc. 1-1). Two of the defendants removed. (Doc. 1). Clarity answered, counterclaimed against MMCPM Logistics, and sued as third-party defendants MMCPM, LLC and the Millers. (Doc. 1-6). Clarity received a default judgment on all claims. (Doc. 34). The MMCPM parties retained new counsel and their claims were revived. (Doc. 58). They filed an amended complaint and answered the counterclaims against them. (Doc. 78; Doc. 81). Clarity answered the amended complaint. (Doc. 82).

The third-party defendants—MMCPM, LLC and the Millers—moved for summary judgment on Clarity's claims against them. (Doc. 96-1). MMCPM Logistics moved for partial summary judgment on all of Clarity's claims against it except the breach of contract claim. (Doc. 97). Clarity responded to both summary judgment motions in a combined memorandum. (Doc. 104). MMCPM, LLC and the Millers replied. (Doc. 105). MMCPM Logistics also replied. (Doc. 106).

### *Analysis*

First, some preliminary matters. In addition to its claims for fraudulent inducement, tortious interference with business relations, and unjust enrichment, Clarity also brought claims for

conversion and replevin against all of the MMCPM parties, and for negligence against the Millers. (Doc. 1-6 at 13-15). Clarity is voluntarily dropping those latter claims, so they will be dismissed. (Doc. 104 at 3).

Next, defendants First Financial Bank and Ian Jordan will be dismissed. The Court previously granted declaratory judgment in First Financial Bank's favor, and there are no outstanding disputes between MMCPM Logistics and First Financial Bank. (Doc. 60). MMCPM Logistics did not name First Financial Bank or Ian Jordan as parties in its amended complaint. (*See* Doc. 67-2). So those two defendants will be dismissed.

Lastly, the MMCPM parties admit that there are factual issues precluding either side from obtaining summary judgment on their breach of contract claims, so those claims are not at issue in these motions. (Doc. 97-1 at 2 n.1). The only claims at issue here are Clarity's claims for fraudulent inducement, tortious interference with business relations, and unjust enrichment.

### A. MMCPM, LLC is not a proper party in this case.

The Court previously denied MMCPM, LLC's Motion to Dismiss the claims against it, instead opting to give Clarity time "to investigate a connection between MMCPM, LLC and MMCPM Logistics." (Doc. 77 at 15). That time has come and gone, and Clarity's investigation has mostly turned up empty.

Here is the sum total of that investigation: The two MMCPM companies have the same owners, were started around the same time, operate out of the same office, and use the same email addresses. (Doc. 101-1 at 22-23, 90-91). The letter that Summer Miller sent to Clarity terminating the contract between Clarity and MMCPM Logistics said "MMCPM, LLC" under Summer's signature. (Doc. 96-11). And Summer was unsure how she divided her time between the two companies. (Doc. 101-1 at 31-32).

On the other hand, only MMCPM Logistics was a party to the contract. (Doc. 78-2). Only MMCPM Logistics performed services for and sent invoices to Clarity. (*See, e.g.*, Doc. 100-25). The termination letter was on MMCPM Logistics letterhead. (Doc. 96-11).

The evidence that Clarity presents (ownership, offices, email addresses) only pertains to MMCPM, LLC and MMCPM Logistics generally. It does not pertain to their relationship in the context of this contract or the work done under it. The mere fact that MMCPM, LLC has a similar name and is owned by the same people cannot subject it to liability under a business deal it had no part in.

Without the facts on its side, Clarity turns instead to the law. But it finds no refuge there, either. Clarity maintains that MMCPM, LLC could be an "alter ego" of MMCPM Logistics. (Doc. 104 at 10-11). The alter ego theory is a method of piercing the

corporate veil that allows a creditor recourse against the persons, usually the shareholders, behind a corporation. *Inter-Tel Techs., Inc. v. Linn Station Props., LLC*, 360 S.W.3d 152, 155 (Ky. 2012).

When, as here, there are two corporations that are not shareholders of each other but have a common owner, they are sister corporations. *See, e.g.*, *Hay v. Shirley*, No. 1:19 CV 2645, 2021 WL 2043151, at *2 (N.D. Ohio May 21, 2021). Veil piercing of sister corporations is called "horizontal" veil piercing. *Id.; see also* 1 Closely Held Corporations 5.06[A] (2021) (defining horizontal veil piercing).

Kentucky courts have not opined one way or another on the horizontal veil piercing concept, but courts in other states have. For example, the Ohio Supreme Court rejected the concept in *Minno v. Pro-Fab, Inc.*, 905 N.E.2d 613 (Ohio 2009). There, the court held that, unlike a shareholder owning a corporation, common ownership of sister corporations doesn't give one of those corporations the right to control the other. *Id.* at 617. So any wrongful act by one of them might be attributed to their common owner, but not to the sister corporation. *Id.* And because the sister corporations do not control each other and are thus not responsible for each other's acts, veil piercing is inappropriate. *Id.*

That is the case here. MMCPM, LLC and MMCPM Logistics share a common owner, but neither corporation controls the other. And

that lack of control means that neither one is responsible for the other's actions. In other words, MMCPM, LLC and MMCPM Logistics are not alter egos. Therefore, because MMCPM Logistics was the only one involved in this contract, MMCPM, LLC is not a proper party to this case.

> **B. Clarity's fraudulent inducement claim fails because the third-party defendants made no representations, and any representations made by MMCPM Logistics were fulfilled.**

Clarity's first claim is for fraudulent inducement against all of the MMCPM parties. (Doc. 1-6 at 12). The gist of the claim is that those defendants told Clarity that they would expand their building capacity to handle the increased workload under the contract, but they never did so. (Doc. 104 at 4-6).

Fraudulent inducement has six elements: (1) a material representation, (2) which is false, (3) known to be false or made recklessly, (4) intended to induce, (5) acted on in reliance, and (6) causing injury. *Flegles, Inc. v. TruServ Corp.*, 289 S.W.3d 544, 549 (Ky. 2009) (citing *United Parcel Serv. Co. v. Rickert*, 996 S.W.2d 464, 468 (Ky. 1999)). The reliance must be reasonable. *Id.* (citing *McHargue v. Fayette Coal & Feed Co.*, 283 S.W.2d 170, 172 (Ky. 1955)).

Here, for starters, any representations to Clarity were made not by the third-party defendants, but by MMCPM Logistics, the company that was actually party to the contract and which actually

did the work. So Clarity's fraudulent inducement claim fails as to the third-party defendants.

That leaves MMCPM Logistics. It offers two reasons why Clarity's fraudulent inducement claim against it fails.

### 1. Reasonable reliance

MMCPM Logistics first argues that Clarity's reliance was not reasonable because Clarity had already decided to move its packing and shipping operations in-house, and because the contract allowed either party to cancel with 30 days' notice. (Doc. 96-1 at 7–9).

Clarity did express interest in moving its packing and shipping operations in-house. (Doc. 96-13). But Clarity had to put in some prep work before that could happen. Clarity sent one of its employees to MMCPM Logistics' building to observe and report back on how Clarity might develop its own logistics operations. (Doc. 96-14). That employee said that Clarity should "run a couple of baseline orders in order to work out unforeseen problems." (*Id.*). Eventually, in July 2019, Clarity began shipping Family Dollar packages itself. (Doc. 96-6 ¶7). Later, in January 2020, it began shipping Dollar Tree packages too. (Doc. 96-15).

But it took time to get to that point. And in the meantime, while Clarity was developing and testing and working out the kinks, MMCPM Logistics continued to ship packages to Family Dollar and Dollar Tree. It's reasonable to assume that Clarity knew it needed MMCPM Logistics' services to help get through the initial period,

until Clarity could handle the logistics work on its own. And it's reasonable to assume that, when it contracted for those services, Clarity relied on MMCPM Logistics' promise to expand its building capacity. Viewing the evidence most favorably to Clarity, that reliance was reasonable under the circumstances.

### 2. Representations fulfilled

MMCPM Logistics' second reason why Clarity's fraudulent inducement claim fails is that MMCPM Logistics fulfilled any representations it made. (Doc. 96-1 at 10). Those representations were about expanding MMCPM Logistics' building capacity to handle the new workload. (Doc. 103-1 at 21). MMCPM Logistics considered three options to do that: (1) buying another building, (2) adding a new building next to their current building, or (3) modifying their current building. (*Id.* at 26–27).

It chose the third option. (Doc. 96-16). It added a new loading dock and ramp space, new electrical work, a production room, and 1,300 square feet of custom pallet rack spaces, altogether costing more than $78,000. (Doc. 100-1 at 56–57, 65; Doc. 100-3).

Despite those renovations, Clarity now argues that MMCPM Logistics failed to follow through on any of the three options it was considering for expanding its building capacity. (Doc. 104 at 4–7). Specifically, Clarity says that "[n]one of the promised additions were built and no square footage was added[]" and that

"[a]ll that was done was that Mr. Miller paid $4,500 to add a parking slab for a truck trailer next to the building." (*Id.* at 5). Clarity also says that "[w]hether a $4,500 concrete pad is consistent or equivalent to acquiring an entirely new building or building an addition to an existing building" is a jury question. (*Id.* at 6).

There are a couple of problems with Clarity's argument. First, "acquiring an entirely new building or building an addition to an existing building" were not the only options on the table. There was a third option that Clarity conveniently omitted: modifying the existing building. (Doc. 103-1 at 26-27). And that's the option that MMCPM Logistics chose. (Doc. 96-16).

Second, Clarity's depiction of those modifications is inaccurate. It was not just a truck ramp. It was also the electrical work, production room, and 1,300 square feet of pallet racks. (Doc. 100-1 at 56-57, 65). And it was not just $4,500. It was over $78,000. (Doc. 100-3). Clarity admitted that it knew MMCPM Logistics had spent that money to renovate its building. (Doc. 102-1 at 13). Clarity also admitted that MMCPM Logistics "fulfilled what they said they were going to do[.]" (Doc. 103-1 at 26-27).

Clarity cannot simultaneously acknowledge those things and also argue that MMCPM Logistics failed to fulfill its representations. It cannot argue that MMCPM Logistics "failed to expand their capacity to store and be able to work with adequate

space" while ignoring the fact that MMCPM Logistics added 1,300 square feet of pallet rack storage. That the additional storage came via custom racking instead of more floor space does not mean that MMCPM Logistics didn't fulfill its representations, especially since Clarity was "not prescriptive in terms of which" option to pursue, and instead chose to "rely[] on [MMCPM Logistics'] expertise . . . to make the determination for the appropriate course of action." (*Id.* at 26).

Therefore, MMCPM Logistics fulfilled any representations it made to Clarity, so Clarity's claim against MMCPM Logistics for fraudulent inducement fails. This also disposes of Clarity's argument that the Millers are not shielded from liability by their LLC membership and are instead individually responsible for false statements made to Clarity. (Doc. 104 at 8). Because MMCPM Logistics fulfilled its representations to Clarity, the Millers made no false statements.

### C. Clarity's tortious interference with business claim fails because there is no admissible evidence that Clarity lost any business.

Clarity's next claim is for tortious interference with business relations against all of the MMCPM parties. (Doc. 1-6 at 12). That claim has six elements: (1) a valid business relationship or expectancy, (2) the defendant was aware of that relationship or expectancy, (3) the defendant intentionally interfered, (4) the motive for the interference was improper, (5) causation, and (6)

special damages. *Khani v. Short*, No. 2019-CA-000867-MR, 2020 WL 5587373, at *5 (Ky. Ct. App. Sept. 18, 2020) (citing *Halle v. Banner Indus. N.E., Inc.*, 453 S.W.3d 179, 188 (Ky. Ct. App. 2014)).

The MMCPM parties argue that Clarity still does business with Family Dollar and Dollar Tree, so Clarity's claim must fail. (Doc. 96-1 at 11–13; Doc. 97-1 at 2). Clarity counters that it can maintain the claim even if it still does business with those clients because it "is not required to show that it lost all work for the customer." (Doc. 104 at 11). Instead, all it has to show is "some evidence that a customer did not give it certain work because of Defendants' tortious conduct." (*Id.*).

Clarity claims it has that evidence in the form of an affidavit signed by Clarity's President, Jim Gavigan. (*Id.*). In that affidavit, Gavigan says that Dollar Tree asked Clarity to submit a bid on a new project, but Dollar Tree did not award that project to Clarity "because of all the issues, errors, mistakes and costs that Defendants had created on our existing work for Dollar Tree." (Doc. 102-5 at 2). The affidavit is the only evidence Clarity offers for this claim.

But as the MMCPM parties correctly point out, the statements from Dollar Tree referenced in the affidavit are hearsay. (Doc. 105 at 7). And because "evidence submitted in opposition to a motion for summary judgment must be admissible[]" at trial, "hearsay evidence . . . must be disregarded." *Alexander v.*

*CareSource*, 576 F.3d 551, 558 (6th Cir. 2009) (quoting *Alpert v. United States*, 481 F.3d 404, 409 (6th Cir. 2007), then quoting *N. Am. Specialty Ins. Co. v. Myers*, 111 F.3d 1273, 1283 (6th Cir. 1997)) (cleaned up).

Gone is Clarity's only evidence of lost business and, with it, its claim for tortious interference with business relations.

### D. Clarity's unjust enrichment claim fails because Clarity has not offered any evidence for it.

Clarity's last claim at issue here is for unjust enrichment against all of the MMCPM parties. (Doc. 1-6 at 14). That claim has three elements: (1) a benefit conferred on the defendant at the plaintiff's expense, (2) the defendant must appreciate that benefit, and (3) the defendant must retain that benefit without paying for it. *Superior Steel, Inc. v. Ascent at Roebling's Bridge, LLC*, 540 S.W.3d 770, 777–78 (Ky. 2017) (quoting *Furlong Dev. Co. v. Georgetown-Scott Cnty. Plan. & Zoning Comm'n*, 504 S.W.3d 34, 39-40 (Ky. 2016)) (internal quotation marks omitted).

Clarity's claim fails because it offers no evidence to satisfy any of those elements. The only thing Clarity says regarding unjust enrichment against the Millers is that "here, there is no contract with Myron and Summer, and they can certainly be subject to a quasi-contract, unjust enrichment claim." (Doc. 104 at 12). And the only thing Clarity says about the Millers' companies is that they are alter egos of each other and, even if a jury finds they

are not, "then MMCPM could certainly be found liable under a theory of unjust enrichment." (*Id.* at 12-13).

Because Clarity offers no evidence to create a factual dispute as to the elements of an unjust enrichment claim, summary judgment is proper on that claim.

Therefore, for the reasons stated above, **IT IS ORDERED** that:

(1) Third-party defendants Myron Miller, Summer Miller, and MMCPM, LLC's Motion for Summary Judgment, (Doc. 96), be, and is hereby, granted;

(2) MMCPM Logistics' Motion for Partial Summary Judgment, (Doc. 97), be, and is hereby, granted;

(3) First Financial Bank is dismissed from this case;

(4) Ian Jordan is dismissed from this case.

This 31st day of January 2023.



Signed By:
*William O. Bertelsman* WOB
United States District Judge